1

2

3

4

5

6

7                        UNITED STATES DISTRICT COURT

8                   FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10    MARCUS SCOTT,                              No.  2:15-cv-01292 KJM AC P

11                    Petitioner,

12         v.                                     FINDINGS AND RECOMMENDATIONS

13    JEFF MACOMBER,

14                    Respondent.

15

16         Petitioner is a California state prisoner who, represented by counsel, is proceeding with an

17    application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The action proceeds on the

18    petition filed on June 16, 2015, ECF No. 1, which challenges petitioner's 2011 conviction for first

19    degree murder with a robbery special circumstance and attempted robbery, along with firearm

20    and gang enhancements for both counts.  Respondent has answered the petition.  ECF No. 11.

21    Petitioner has filed a traverse.  ECF No. 22.  For the reasons that follow, the undersigned

22    recommends that the petition be denied on the merits.

23                                   BACKGROUND

24    I.      Trial Court Proceedings

25         The following statement of the case is taken from the unpublished opinion of the

26    California Court of Appeal on direct review:[1]

27    _____

28    [1]  The undersigned has independently reviewed the trial record, and confirms the accuracy of the
      state court's recitation of the evidence presented at trial.

                                          1

<u>The Gang Feud and Prior Shootings</u>

Robert Quinn, a detective in the gang suppression unit, testified about African–American criminal street gangs in Sacramento. Sacramento is a "red" town; the Bloods outnumber the Crips by three-to-one. The three major groups of Bloods are the Meadowview Bloods, the Oak Park Bloods, and the Del Paso Heights Bloods. Because there are so many Bloods, there is a lot of Blood–on–Blood crime, feuds between subsets. The largest subset of the Oak Park Bloods is FAB, Fourth Avenue Bloods, now known as "Fuck A Bitch." The primary activities of FAB are robberies, shootings, gun possession, and narcotic sales. The Elm Street Bloods is a subset of the Del Paso Heights Bloods.

Grant and Scott are active FAB members. Jumal Gray is a Blood, although his set is unknown. Quinn did not have enough evidence to say that Dixon was a gang member. Perell Mark Waters, the victim, was a member of the Elm Street Bloods.

A series of violent crimes between FAB and the Elm Street Bloods began in 2009. It began with the robbery of Tommy Martinez, known as Tommy Guns, a member of the Beast Mob or Elm Street Bloods. This crime was followed by a fistfight, a running gun battle, and several unreported shootings. Arguments or problems between gangs are known as funks; the individual gang members have beefs.

In November, Scott, known as Nootie or Nutchy, suffered a gunshot wound to his shoulder when his car was shot at during one of the shootings. Grant was shot at the same day, although he was not hit. They believed the Elm Street Bloods were responsible, especially Waters and two others known as Baby Joe and G–Parkway.

Scott discussed the shooting with Lavola Fields. Fields is the mother of Latorria Jones, who was Scott's girlfriend at the time (they later married). Scott was angry about the shooting because his daughter could have been in the car and killed. Fields told him to "let it go." Scott said no; he was from FAB and "we don't play that way." Fields told the police she heard Scott threaten to kill Waters and Baby Joe. "I'm going to get them. Them niggas is dead. I'm not playing." At trial, she claimed she had lied because she was angry with Scott. She testified Scott said he would retaliate and Grant said he had Scott's back. She told the police that Grant had said, "FAB, you know I got your back, whatever you need done, I got it—I got it, you know. We keep 'em ready."

Two weeks before the shooting, Fields heard clicking coming from one of her bedrooms. She knew it was a gun. She told the police she walked in and saw Scott with a nine-millimeter gun. He said it was the type of gun used earlier to shoot him. At trial, Fields said she also lied about seeing the gun because of her anger at Scott.

/////

/////

2

Text Messages

The police went through thousands of text messages between the parties involved. There were several text messages relating to robberies or "licks." Some were about retaliating. On November 27, 2009, Grant texted Scott, "This little bitch I know is having a party. We can try catch one of the Elm Street niggas slippin'." On December 10, there were several text messages about Waters winning $4,000 at dice. The day of the shooting, Grant texted Scott, "So wassup, blood? We keep saying we fittin' to get blood, and we ain't did shit, blood." The next text message read, "Don't matter. We always going to be able to get him. I got the address and shit, but we hittin' Mark tonight."

The Shooting

On December 15, Grant texted Gray, who went to his apartment in his white Buick.[2] Gray also picked up Scott. Scott had a .22–caliber semiautomatic gun and Gray gave his nine millimeter to Grant. Later, they met up at May Street, "Cuz that's where we kick it at." They smoked weed and Dixon joined them. They left in Gray's car to "hit a lick," commit a robbery. It was planned right there; Gray thought it was a spur of the moment decision. They discussed it in the car.

First, they went to the AM/PM where each person gave Gray $5 for gas. Scott went inside to pay for it. He was wearing a multicolored jacket. Then they went to the Woodbridge Apartments to do a robbery. Grant still had Gray's gun. Gray assumed it would be used in the robbery. At the apartments, Grant told Gray where to park. Gray understood he would be the getaway driver and backed into someone's parking space. The other three got out and walked behind the apartments. Gray stayed in the car and smoked marijuana.

The next thing Gray heard was gunshots. Dixon came running to the car before the shots stopped. He said he ran over a girl. Dixon said "go," and Gray drove away slowly; Scott and then Grant jumped in.

Miguel McGrigg lived at the Woodbridge Apartments and Waters was his neighbor. He was in his car about to go to the store when he saw Waters walk by with about four other men. A few seconds later he heard shots, about a dozen. He saw two shooters; one on either side of Waters's car. The one on the passenger side was tall and thin and wore a multicolored jacket; the one on the driver's side was shorter.[3] The bullets went through the driver's windshield, but none appeared to hit Waters. Waters got out of the car and looked at one

---

[2] Gray pled to attempted robbery and voluntary manslaughter for the benefit of a gang. He received a sentence of 21 years and six months in prison in exchange for testifying truthfully for the People.  [footnote in original text]

[3] Grant is six-foot four-inches and Scott is five-foot seven-inches.  [footnote in original text]

of the shooters. Waters was then shot. McGrigg saw one man run when the shooting started.

After the shooting, McGrigg went to his apartment and had his wife call the police. He then went to Waters, and saw bullet holes in his stomach. A white car left quickly.

When the police arrived, Waters was lying on his back next to his car. The engine was running and the car was pushed up against another car. Waters was breathing, but did not respond to questions. He was bleeding from bullet holes on the left side of his body. There were nine bullet holes in the windshield and four in the driver's window. The police found seven .22–caliber casings and four nine-millimeter casings.

Waters was pronounced dead soon after he arrived at the hospital. The cause of death was a gunshot wound to the abdomen that hit his large and small intestines and his aorta (the largest blood vessel), cut his ureter in half, hit his liver, and then exited his body. Waters had seven gunshot wounds.

After the Shooting

After the shooting, Gray drove to Dixon's nearby apartment complex and dropped him off. Gray heard police sirens so he returned to the apartment complex. Grant called Dixon to find out which apartment was his and Dixon, who had changed clothes, came out to meet them. Everyone was panicking. Gray saw Grant wash his hands with bleach. At the preliminary hearing, Gray testified both Grant and Scott washed their hands with bleach. They said, they "got him." Grant said, "My cousin said rock, so I rocked." Dixon was "freaked out." No one talked about a robbery. Gray thought he and Dixon "got played." They were told it was going to be a robbery when it was a murder.

Dixon's girlfriend, Ciara Gore, and his sister lived in the apartment. Gore told the police she was in bed when Dixon called and asked her to open the door. Five men rushed in, all scared and nervous. One had a gun. They washed the gun with bleach. Dixon maintained he did nothing and Grant confirmed this. Gore told the police that Grant said he caught Waters by his car and shot him. They shot him because he was from Elm Street. No one mentioned a robbery.

That night, shots were fired into Scott's car.

Grant and his girlfriend went to a Days Inn after the shooting. They went to the motel because of what happened to Waters. Grant was afraid due to threats. The next night, Grant sent a text message, "Got a nine for sale, asking 50."

Defendants' Statements

The police interrogated all three defendants and the videotape of each interrogation was played to that defendant's jury.

4

The police questioned Dixon twice. In the first interview he denied any involvement in the shooting; he claimed he was with his "baby mama" that night, "whatever night y'all are talking about." He eventually admitted he was present at the shooting in the second interrogation. He knew both Scott and Grant had guns. They saw Waters and someone else walk to his car and followed them. Dixon was behind Scott and Grant. Grant said something to Waters's companion who replied he did not want any problems. Scott and Grant pulled out their guns and started firing. Both fired. The man with Waters ran and Dixon ran. Dixon bumped into a girl as he ran. The shooting was still going on.

Dixon said the robbery was Scott's idea. Waters had marijuana and money from a dice game. They told him that if he came, he would get half. Dixon was "definitely" not there to kill Waters. Afterwards, he asked what happened and they told him to shut up. He asked to be taken to his sister's. At his sister's, Grant and Scott washed up and asked for bleach. Dixon thought they shot Waters for payback.

The police also questioned Grant twice. The first time, he denied any involvement and suggested that Scott did the shooting by himself. The second interrogation was lengthy and Grant eventually admitted his involvement. Grant said they went to the apartments to rob Waters because he had money. When Waters came out, however, Scott wanted to shoot him. Grant gave the nine-millimeter gun to someone named Kev. When Scott shot, Grant ran.

Later, Grant admitted there was no Kev. Only he, Scott, and Dixon were present. Dixon ran. Grant stood at the window of Waters's car and told him he "needed everything." Scott said no and started shooting. Grant said Scott took the gun from him. Grant eventually admitted he shot into the car, but claimed he did not hit Waters. He said Scott took his gun and fired three more times.

Scott was questioned only once. He said he knew nothing about Waters's murder except that people said he was supposed to have done it. Scott repeatedly denied he was at the shooting, even though the police told him that witnesses had said he was there. His denials continued when the police confronted him with cell phone records showing that his phone was in the area. He claimed he was in the south area cheating with another girl. Later, he said he did not know if he was in the south area.

Only Scott presented a defense at trial. Tiffany Miller, the mother of Scott's child, testified Scott was at her apartment that night from 8:30 until 11:00.

<u>Convictions and Sentencing</u>

The jury found Grant guilty of first degree murder (Pen. Code,[4] § 187), with a robbery special circumstance (§ 190.2, subd. (a)(17)(A)), and attempted robbery (§ 664/211). The jury found the

---

[4] Further undesignated statutory references are to the Penal Code.  [footnote in original text]

firearm (§ 12022.53, subd. (b), (c) & (d)) and gang (§ 186.22, subd. (b)(1)) enhancements true as to both counts. At sentencing, the trial court found Grant in violation of probation, terminated probation, and sentenced him to the midterm of four years in prison on a prior burglary charge. On count one, the murder charge, the court sentenced Grant to life without parole, plus 25 years to life in prison on the greatest firearm enhancement, plus ten years for the gang enhancement. The court stayed sentence on count two, the attempted robbery, pursuant to section 654.

The jury found Scott guilty of first degree murder (§ 187), with a robbery special circumstance (§ 190.2, subd. (a)(17)(A)), and attempted robbery (§ 664/211). The jury found the firearm (§ 12022.53, subd. (b), (c) & (d)) and gang (§ 186.22, subd. (b)(1)) enhancements true as to both counts. At sentencing, Scott made an oral motion for a new trial, which the court denied. The court sentenced Scott to life without parole on count one, the murder, plus 25 years to life in prison on the greatest of the firearm enhancements, plus 10 years in prison for the gang enhancement, and stayed sentence on count two, attempted robbery.

People v. Scott, No. C068543, 2013 Cal. App. Unpub. LEXIS 8861, 2013 WL 6485269, at *1–5 (Cal. App. 3 Dist., 2013) (unpublished).

## II.   Direct Appeal

Petitioner timely appealed and the California Court of Appeal affirmed the judgment of conviction on December 10, 2013. Id. at *3, 2013 WL 6485269 at *1. The California Supreme Court denied review on March 19, 2014. Lodged Doc. No. 26.

## III.   State Habeas Proceedings

Petitioner did not file any state habeas corpus petitions challenging his convictions.

## IV.   Federal Habeas Proceedings

The instant federal petition was filed on June 16, 2015. ECF No. 1. Respondent answered on September 17, 2015. ECF No. 11. Petitioner filed a traverse on February 9, 2016. ECF No. 22.

## STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits

in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. Harrington v. Richter, 131 S. Ct. 770, 785 (2011).

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in issue is clearly established by Supreme Court precedent." Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407-08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

Review under § 2254(d) is limited to the record that was before the state court. Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011). The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it. Id. In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did." Id. at 1399. Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis." Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir. 2008) (en banc).

7

1    Relief is also available under AEDPA where the state court predicated its adjudication of

2    a claim on an unreasonable factual determination.  Section 2254(d)(2).  The statute explicitly

3    limits this inquiry to the evidence that was before the state court.  Even factual determinations

4    that are generally accorded heightened deference, such as credibility findings, are subject to

5    scrutiny for objective reasonableness under § 2254(d)(2).  See Miller-El v. Dretke, 545 U.S. 231

6    (2005) (ordering habeas relief where state court denied Batson claim on the basis of an

7    unreasonable factual finding that the prosecutor's asserted race-neutral reasons for striking

8    African American jurors were true).  State court factual findings do not bar federal habeas relief

9    under § 2254(d)(2) where they are made according to a flawed process, see Taylor v. Maddox,

10   366 F.3d 992, 999-1001 (9th Cir.), cert. denied, 543 U.S. 1038 (2004), or where they are

11   substantively unreasonable in light of the evidence presented in the state proceeding, see Wiggins,

12   539 U.S. at 528.

13   Where one of the § 2254(d) exceptions applies, relief is not barred by AEDPA and the

14   federal habeas court decides the claim de novo.  See Panetti v. Quarterman, 551 U.S. 930, 948

15   (2007).  Accordingly, to prevail in federal habeas proceedings, a petitioner must establish the

16   applicability of one of the § 2254(d) exceptions and also must also affirmatively establish the

17   constitutional invalidity of his custody under pre-AEDPA standards.  Frantz v. Hazey, 533 F.3d

18   724 (9th Cir. 2008) (en banc).

19                                          DISCUSSION

20   I.      Claim One: Batson Claim

21          A.   Petitioner's Allegations and Pertinent State Court Record

22   Petitioner alleges that his equal protection rights were violated when the trial court failed

23   to follow proper procedures in responding to his motion under Batson v. Kentucky, 476 U.S. 79

24   (1986).  ECF No. 1 at 33.

25   The immediate Batson challenge focuses on two prospective jurors – Ms. Murphy

26   ("P.M."), and Ms. Roberson ("S.R.") – both of whom are African-American.  The court notes that

27   /////

28   /////

8

petitioner asserts that only three African-Americans were seated as prospective jurors.[5]  ECF

No. 1 at 7.  The court finds it impossible to verify this contention, however, because the juror

questionnaires did not call for the race or ethnicity of potential jurors, see, 2 Aug. CT at 1-58, and

the record of proceedings on the Batson motion does not include any information about the racial

composition of the venire or those prospective jurors who were questioned on voir dire, see RT

80-84.  In any event, the prosecution used peremptory challenges to excuse P.M. and S.R.  Aug.

RT at 236, 274.  Defense counsel then made a Batson motion challenging the propriety of the

prosecution's dismissal of these two prospective jurors.  1 RT at 80.  The court will summarize

the background, questions, and responses relevant to these prospective jurors before turning to the

Batson motion.

        1.      Prospective Juror P.M.

      P.M. was employed as a school bus driver at the time of jury selection.  2 Aug. CT at 48.

The trial court asked P.M.'s juror group whether any had a family member or close friend who

had been arrested for any criminal offense, and she responded that her brother had been arrested

for burglary.  1 Aug. RT at 188.  P.M. noted that her brother had received a 113 year sentence for

that crime because he was sentenced under California's Three Strikes Law.  Id. at 189.  The trial

court asked whether she felt "the system" had treated her brother unfairly and P.M. answered that

she did not.  Id.  Of her brother's incarceration, P.M. noted "[t]hat's the life he chose to live."  Id.

Under further questioning about her brother's conviction, P.M. stated that she felt his defense

attorney had done an adequate job, that the prosecutor and law enforcement had been fair, and

that she had no concerns about the judge in her brother's case.  Id. at 189-190.  She stated that she

had not maintained any contact with her brother since his incarceration.  Id. at 190.  In her

questionnaire, P.M. also wrote that a relative had been arrested for "escape."  2 Aug. CT at 48.

When the trial court inquired about this, she stated that the same brother who had been arrested

for burglary had also escaped from jails in Butte and Sutter Counties and an unspecified prison in

Texas.  1 Aug. RT at 220.  She reiterated that she had no contact with him.  Id.

---

[5] Defense counsel used a peremptory challenge to excuse a third African American prospective
juror – Michael Cole.  Aug. RT at 236.

Defense counsel asked P.M. whether she would have any problem considering an alibi or the testimony of an alibi witness and she stated that she would not. Id. at 229. She also stated that her brother's aforementioned circumstances would not "tip the playing field" against the defendant. Id.

The prosecution asked P.M. about her feelings toward her brother's sentence and she simply stated that she would never see him again. Id. at 232. P.M. also noted that her contact with her brother prior to his incarceration had been infrequent and that she primarily learned of his circumstances through their parents. Id. She stated that her parents had accepted her brother's sentence "for what it was." Id. The prosecution asked whether P.M. had any problem with her brother's sentence and she reemphasized that she did not. Id. at 232-233.

2.     Prospective Juror S.R.

S.R.'s questionnaire indicated that she was employed in the civil service for the state of California. 2 Aug. CT at 47. It also indicated that she had attained a master's degree in social work and had previously been employed by the state Department of Justice and the Sacramento County Jail. Id. At the time of trial, she stated that she worked for a state program called "Every Woman Counts" which administered funding enabling low-income women to receive mammograms and clinical breast exams. 1 Aug. RT at 255.

The trial court inquired whether S.R.'s jury group had any family member or close friend who had been arrested. Id. at 241. S.R. indicated that her father had long ago been arrested for driving under the influence and that, twenty years prior, one of her brothers had been arrested for armed robbery, but had since reformed. Id. She also stated that, within the past year, a different brother had been arrested for armed robbery by the Sacramento Police Department. Id. at 241-242. S.R. stated that she thought the officers from that department had treated her brother fairly. Id. at 242. She noted that her brother's armed robbery had been committed against their mother and that she was primarily thinking of her mother's protection. Id. S.R. related that her brother's case was still pending and was being prosecuted by the same district attorney's office as the immediate case. Id. at 243. The trial court asked S.R. whether any of her relatives' experiences

/////

1   with law enforcement or the criminal justice system would spill over into the current case. <u>Id.</u> at

2   244. S.R. hesitated a moment before replying that they would not. <u>Id.</u>

3        S.R. was subsequently asked whether she or any close acquaintance had ever been the

4   victim of a crime. <u>Id.</u> at 250. She stated that, in addition to her brother's armed robbery of their

5   mother, her car had been stolen approximately fifteen years ago. <u>Id.</u> The perpetrator was

6   arrested, her car was returned, and she did not have to come to court in connection with that

7   incident. <u>Id.</u> at 250-251.

8        Defense counsel inquired about whether her recently arrested brother had used a gun in

9   the armed robbery of their mother. <u>Id.</u> at 261. S.R. stated that her brother had used a knife. <u>Id.</u>

10   Defense counsel noted that the current case involved allegations that defendant had used a gun

11   and was part of a gang. <u>Id.</u> In light of those allegations, defense counsel asked what S.R. felt

12   about her ability to serve on the case and she responded that she could "serve and be fair." <u>Id.</u>

13        The prosecution asked whether S.R.'s brother was currently incarcerated in the

14   Sacramento County Jail and she replied in the affirmative. <u>Id.</u> at 267. Asked whether she visited

15   or wrote to him, S.R. replied that she intended to both but hadn't yet. <u>Id.</u> She stated that she had

16   not spoken to him since his arrest. <u>Id.</u> The prosecution asked whether she had met the district

17   attorney associated with her brother's case or if she knew which district attorney was involved

18   and S.R. replied in the negative to both questions. <u>Id.</u> Next, the prosecution inquired whether

19   S.R. felt that she could judge the current case fairly given her brother's situation and she

20   responded in the affirmative. <u>Id.</u> at 268. She noted that she believed in her ability to put her

21   brother's circumstances aside because she "[knew] those circumstances partially . . . and [her]

22   brother was under the influence of drugs and did what he did because of that." <u>Id.</u> Asked

23   whether she believed her brother should have been arrested, she replied "absolutely." <u>Id.</u> Then

24   the prosecution asked whether she would have any concerns rendering a guilty verdict against the

25   defendant knowing that he would be in the same jail where her brother was currently

26   incarcerated. <u>Id.</u> S.R. stated that it wouldn't bother her. <u>Id.</u> Finally, the prosecution asked

27   whether S.R. thought the burden of proof in a criminal trial should be higher than beyond a

28   reasonable doubt, and she replied "I don't think it can be." <u>Id.</u> at 273.

3.      Batson Motion

As noted above, the prosecutor used peremptory challenges against P.M. and S.R.

Defense counsel then brought a Batson motion which the trial court denied:

> **Mr. Deckler:**  Judge, I informed the court that I would be making a Batson-Wheeler Motion.
>
> The first juror that caused concerns, in my mind, is Ms. Murphy, a black juror.  There was nothing in her background that seemed to indicate that she would be pro defense, pro Mr. Scott.  If anything, her answers could be considered pro prosecution.
>
> And then Ms. Roberson, the most recent juror to be excluded, black female, her background is basically total law enforcement.  She worked for DOJ.  She worked for the jail.  She was not particularly sympathetic towards her brother, who she has already come to the conclusion robbed her mother.  And this is even before the trial.  So not only did she not express sympathy towards her brother, she expressed an antipathy towards him.  In fact, she gave the reason that he committed the crime.  She said it was because of his drug background.
>
> So there was nothing in her background to lead anybody to believe that she was going to be favoring Mr. Scott, favoring the defense.  Again, if anything, she would be favoring the prosecution.
>
> . . .
>
> I am concerned these two most recent challenges that these jurors are being challenged only on a racial basis.
>
> **The Court:** All right.  In this case the court is aware of the defense burden in showing that the jurors are being challenged for a racially discriminatory reason.
>
> In this case the court finds as to Ms. Murphy, that she indicated that her brother was to be in prison, essentially, for something like 114 years, which is an incredibly long time for a burglary case. And although she indicated she didn't have a problem with it, she said she would never see him again.  And she is the one that brought up the fact that he was a three strikes and how long his sentence was.
>
> And although she said that it did not bother her, I think that the People could find that that would be a concern, that she does have a brother who for only a burglary is incarcerated for such an extended period of time and that she expressed concern that she would never be able to see him again.
>
> So I think that the People certainly have a race-neutral reason for excusing Ms. Murphy, who was a prospective juror.
>
> As to Ms. Roberson, I also find that there is a valid race-neutral reason to excuse her.  Although her mother was the victim of the

12

brother who committed the armed robbery with a knife, she indicated that she had intended to go see him in jail, just has not done that yet, but she intended to have contact with him.

He is clearly, in her mind, in custody in the same facility as the defendants in this case. They're both in the Sacramento County Jail. So I think that there could certainly be some concerns in that regard, as well as the fact that she made an excuse as to why she felt the brother had committed the armed robbery, that it was only because of drugs. So she has somewhat attenuated his conduct by giving him an excuse that it was the drugs that made him attack the, mother who is now deceased. I think that could be a concern for the prosecutor, as well as the fact that she is a social worker, which tends to be an occupation that some prosecutors are concerned about.

So I am going to make a finding that these jurors were excused for race-neutral reasons. However, I am going to permit Ms. Brown to augment the record or comment on anything that the court said.

**Ms. Brown:** Actually, everything that your Honor just said were the reasons that I wrote down for challenging both of those jurors.

The only thing I wanted to add is that there was an African American male, Mr. Cole, who had nothing of the sort in his background. He had military background. His son had only had an arrest or a citation for a lightrail ticket, and he was perfectly suited for this jury, it seems to the People; however, the defense challenged him.

So I would just like to note that he was an African American male on this jury who would have been perfectly acceptable to the People, and I'll leave it at that.

1 RT at 80-84.

### B. The Clearly Established Federal Law

Purposeful discrimination on the basis of race in the exercise of peremptory challenges violates the Equal Protection Clause of the United States Constitution. See Batson, 476 U.S. 79; Johnson v. California, 545 U.S. 162 (2005). So-called Batson claims are evaluated pursuant to a three-step test:

First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations]. Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]

13

1    Johnson, 545 U.S. at 168 (footnote omitted); see also Tolbert v. Gomez, 190 F.3d 985, 987-88

2    (9th Cir. 1999) (en banc).

3           At the third step of Batson, "the trial court determines whether the opponent of the strike

4    has carried his burden of proving purposeful discrimination." Purkett v. Elem, 514 U.S. at 765,

5    768 (1995).  Although the burden remains with the defendant to show purposeful discrimination,

6    the third step of Batson primarily involves the trier of fact.  After the prosecution puts forward a

7    race-neutral reason, the court is required to evaluate "the persuasiveness of the justification." Id.

8    To accept a prosecutor's stated nonracial reasons, the court need not agree with them.  The

9    question is not whether the stated reason represents a sound strategic judgment, but "whether

10   counsel's race-neutral explanation for a peremptory challenge should be believed." Hernandez v.

11   New York, 500 U.S. 352, 365 (1991) (plurality opinion).  This credibility determination must be

12   made in light of the totality of the relevant facts about a prosecutor's conduct. Batson, 476 U.S.

13   at 94; see also Hernandez, 500 U.S. at 363.

14           C.  The State Court's Ruling

15           Petitioner raised this claim on direct appeal.  Because the California Supreme Court

16   denied discretionary review, the opinion of the California Court of Appeal constitutes the last

17   reasoned decision on the merits and is the subject of habeas review in this court. See Ylst v.

18   Nunnemaker, 501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012).  The

19   court of appeal ruled as follows:

20           "Both the state and federal Constitutions prohibit the use of
             peremptory challenges to remove prospective jurors based solely on
21           group bias. (Batson, supra, 476 U.S. at p. 89, 106 S. Ct. 1712;
             Wheeler, supra, 22 Cal.3d at pp. 276–277, [ ].) Recently, 'the
22           United States Supreme Court reaffirmed that Batson states the
             procedure and standard to be employed by trial courts when
23           challenges such as defendants are made. "First, the defendant must
             make out a prima facie case by 'showing that the totality of the
24           relevant facts gives rise to an inference of discriminatory purpose.'
             [Citations.] Second, once the defendant has made out a prima facie
25           case, the 'burden shifts to the State to explain adequately the racial
             exclusion' by offering permissible race-neutral justifications for the
26           strikes. [Citations.] Third, '[i]f a race-neutral explanation is
             tendered, the trial court must then decide ... whether the opponent
27           of the strike has proved purposeful racial discrimination.'
             [Citation.]" ' [Citation.] The high court clarified that 'a defendant
28           satisfies the requirements of Batson's first step by producing

                                              14

evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.' [Citation.]" (People v. Guerra (2006) 37 Cal.4th 1067, 1100; accord People v. Williams (2013) 56 Cal.4th 630, 649.)

We consider the entire record before the trial court in deciding whether a prima facie case was stated, but certain types of evidence may be especially relevant, such as whether the opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptory challenges against the group; that the jurors in question share only the characteristic of their membership in the group; and whether the opponent failed to engage these same jurors in more than desultory voir dire. (People v. Bonilla (2007) 41 Cal.4th 313, 342 (Bonilla ).)

"Although the prosecutor's excusal of all members of a particular group may give rise to an inference of impropriety, especially if the defendant belongs to the same group, that inference, as we have observed, is not dispositive. [Citations.]" (People v. Crittenden (1994) 9 Cal.4th 83, 119.) " 'As a practical matter, however, the challenge of one or two jurors can rarely suggest a pattern of impermissible exclusion.' [Citations.]" (Bonilla, supra, 41 Cal.4th at p. 343.) "[T]he small absolute size of this sample makes drawing an inference of discrimination from this fact alone impossible." (Ibid.)

The three-step Batson analysis "is not so mechanical that the trial court must proceed through each discrete step in ritual fashion." (People v. Adanandus (2007) 157 Cal.App.4th 496, 500.) "Though not strictly required, it is the better practice for the trial court to have the prosecution put on the record its race-neutral explanation for any contested peremptory challenge, even when the trial court may ultimately conclude no prima facie case has been made out." (Bonilla, supra, 41 Cal.4th at p. 343, fn. 13.)

"When a trial court denies a Wheeler motion without finding a prima facie case of group bias, the appellate court reviews the record of voir dire for evidence to support the trial court's ruling. [Citations.] We will affirm the ruling where the record suggests grounds upon which the prosecutor might reasonably have challenged the jurors in question. [Citation.]" (People v. Farnam (2002) 28 Cal.4th 107, 135.) "Because Wheeler motions call upon trial judges' personal observations, we view their rulings with 'considerable deference' on appeal. [Citation.]" (People v. Howard (1992) 1 Cal.4th 1132, 1155.)

. . .

Scott contends he demonstrated a prima facie case of discrimination because the People used peremptory challenges to remove two of the three African–American prospective jurors. He argues these two prospective jurors gave pro-prosecution answers, supporting the inference that they were removed for discriminatory reasons.

/////

15

Although the trial court did not use the term "prima facie case," we read the record to show that the trial court found Scott failed to make a prima facie case. We agree with the trial court that the record of voir dire provides race-neutral reasons for excusing P.M. and S.R. and Scott failed to provide evidence sufficient to support an inference of discrimination.

Relying on Ninth Circuit cases (<u>Johnson v. Finn</u> (9th Cir. 2011) 665 F.3d 1063, 1069; <u>Williams v. Runnels</u> (9th Cir. 2006) 432 F.3d 1102, 1107–1108), Scott contends the trial court erred in considering what it perceived as race-neutral reasons for removing these jurors. As he recognizes, however, our Supreme Court has held that such consideration is appropriate and we are bound to follow our Supreme Court. (<u>Auto Equity Sales, Inc. v. Superior Court</u> (1962) 57 Cal.2d 450, 455–456.) Our Supreme Court has repeatedly considered race-neutral reasons appearing on the record to find that no prima facie case was established. (E.g., <u>People v. Streeter</u> (2012) 54 Cal.4th 205, 225 [where record of voir dire showed race-neutral reasons for recusal of three African–American prospective jurors, no inference of discriminatory purpose]; <u>People v. Davis</u> (2009) 46 Cal.4th 539, 584 [no inference of discrimination where "obvious race-neutral grounds" for challenges to five Hispanic-named prospective jurors]; <u>People v. Avila</u> (2006) 38 Cal.4th 491, 554 [prospective juror's answers "disclosed a number of 'reasons other than racial bias for any prosecutor to challenge her' "].)

Here, the prosecutor raised her concerns about P.M. and S.R. in questioning them. This is not a case where the excused jurors were asked no or only perfunctory questions, the type of evidence that supports an inference of discrimination. (<u>See People v. Kelly</u> (2007) 42 Cal.4th 763, 779.) The primary concern with P.M. was her brother's lengthy sentence for burglary. As P.M. stated, she would not see him again. Although P.M. professed that neither she nor her parents "had a problem" with the sentence, his fate was a legitimate, race-neutral concern.[6] The race-neutral reasons for excusing S.R. were even stronger. As we noted ante, Scott exaggerates S.R.'s law enforcement background, which was decades in the past. She had a degree in social work and "[p]eremptory challenges based on a juror's experience in counseling or social services is a proper race-neutral reason for excusal. [Citation.]" (<u>People v. Clark</u> (2011) 52 Cal.4th 856, 907–908.) Her brother was facing prosecution by the same district attorney and was housed in the same jail as Scott, and she intended to see him—a fact emphasized by the People and the trial court. We also find highly significant the fact that she hesitated before saying there would be no spillover effect from her brother's case into the current case. Further, she partially excused her brother's behavior

[6] Scott challenges the trial court for misstating P.M.'s testimony as expressing a concern that her parents would miss her brother due to his incarceration. He also claims the trial court improperly found P.M. raised the issue of three strikes when in fact her reference was in response to the court's question. We find the record shows race-neutral reasons for excusing P.M. and S.R. without relying on the challenged observations.  [footnote in original text]

as being due to drug addiction, suggesting she might be sympathetic to a defendant where, as here, drugs were involved, and that she did not have the strict personal responsibility mindset a prosecutor would tend to prefer. " 'One of the most regular uses of peremptory strikes is to eliminate from the final jury venire persons whom either side believes will be too sympathetic to his opponent.' [Citation.]" (<u>People v. Dunn</u> (1995) 40 Cal.App.4th 1039, 1054.)

The dismissal of two prospective jurors is too small a sample alone to show a pattern of discrimination. (<u>Bonilla</u>, <u>supra</u>, 41 Cal.4th at p. 343.) Moreover, the People did not excuse all African–American prospective jurors. M.C. was an acceptable juror who was excused by the defense. That the People accepted him was an indication that the exclusion of P.M. and S.R. was not due to their race. (See <u>People v. Lenix</u> (2008) 44 Cal.4th 602, 629 [People's acceptance of panel with Black juror strongly suggests race not a motive].)

Our consideration of the relevant factors and review of the record fail to support an inference that the People excused either P.M. or S.R. on the basis of her race. The trial court did not err in denying Scott's Batson–Wheeler motion.

Lodged Doc. 24 at 12-16.

### D. Objective Reasonableness Under § 2254(d)

#### 1. Trial Court's Application of Batson

There is no question that the relevant, last reasoned decision for AEDPA purposes on this issue belongs to the state court of appeal – reproduced <u>supra</u>. Nevertheless, the court believes analysis of this issue will be aided by an evaluation of how the superior court applied <u>Batson</u> to the facts before it. After petitioner's counsel raised his <u>Batson</u> motion, the trial judge began by stating that she was "aware of the defense burden in showing that the jurors are being challenged for a racially discriminatory reason." 1 RT at 82. Rather than determining whether a prima facie showing had been made, however, the judge proceeded immediately to steps two and three of the <u>Batson</u> analysis, which were misapplied.

The judge did not require the prosecutor to satisfy her step two burden of stating valid, race-neutral reasons for her strikes, as <u>Batson</u> requires. Instead, the trial judge took it upon herself to supply various race-neutral reasons which the prosecutor might have considered when she struck both jurors. <u>Id.</u> at 82-83. The judge then relied solely on these potential explanations to "make a finding" that the jurors had been excused for race-neutral reasons. <u>Id.</u> at 83. This analytical process is impossible to square with the test the Supreme Court announced in <u>Batson</u>,

17

1   which demands that the prosecutor offer her *actual* reasons for striking the jurors and that the

2   court make a credibility determination about those stated reasons.   See Johnson 545 U.S. at 172;

3   Snyder v. Louisiana, 552 U.S. 472, 477 (2008).

4          In this case, after the trial judge had already reached her conclusion, she offered the

5   prosecutor "a chance to augment the record or comment on anything that the court said." 1 RT at

6   83.  The prosecutor quickly agreed with the trial court's favorable findings, adding only that

7   defense counsel had also struck an African-American juror – Michael Cole – whom the

8   prosecution would have accepted.  Id. at 83-84.  This after the fact augmentation of the record

9   does little to rehabilitate the trial court's erroneous and unreasonable application of Batson.

10                     2.        The Court of Appeal's Opinion

11          The court of appeal denied petitioner's claim after concluding that the trial court had

12   properly determined that petitioner failed to make a prima facie showing of discrimination.  This

13   finding constitutes an unreasonable application of Batson and, to the extent it amounts to a factual

14   finding, an unreasonable determination of the facts under section 2254(d)(2).  The record shows

15   unequivocally that the trial court never explicitly addressed the question of whether petitioner had

16   made a prima facie Batson showing.  As noted above, the trial judge briefly mentioned that she

17   understood the "defense burden," but wholly failed to articulate the contours of that burden or

18   explicate the standard she was applying.  Batson sets the movant two tests: the prima facie

19   showing of purposeful discrimination at the first step, and the ultimate establishment of that

20   discrimination at the third.  476 U.S. at 97-98.  At the first step:

21          "[A] defendant may establish a prima facie case of purposeful
           discrimination in selection of the petit jury solely on evidence
22          concerning the prosecutor's exercise of peremptory challenges at
           the defendant's trial. To establish such a case, the defendant first
23          must show that he is a member of a cognizable racial group, and
           that the prosecutor has exercised peremptory challenges to remove
24          from the venire members of the defendant's race. Second, the
           defendant is entitled to rely on the fact, as to which there can be no
25          dispute, that peremptory challenges constitute a jury selection
           practice that permits 'those to discriminate who are of a mind to
26          discriminate.'  Finally, the defendant must show that these facts and
           any other relevant circumstances raise an inference that the
27          prosecutor used that practice to exclude the veniremen from the
           petit jury on account of their race."

28

1    Id. at 96.  The record provides no indication whatsoever that the trial court was evaluating

2    petitioner's claim under this rubric.  Instead, as noted supra, the trial court proceeded immediately

3    with an erroneous, conflated application of steps two and three.

4          Even if the trial court intended to apply the actual first step test, its articulated rationale for

5    denying petitioner's motion cannot be squared with the Supreme Court's direction that:

6                   We did not intend the first step to be so onerous that a defendant
                    would have to persuade the judge – on the basis of all the facts,
7                   some of which are impossible for the defendant to know with
                    certainty – that the challenge was more likely than not the product
8                   of purposeful discrimination. Instead, a defendant satisfies the
                    requirements of Batson's first step by producing evidence sufficient
9                   to permit the trial judge to draw an inference that discrimination has
                    occurred.
10

11   Johnson, 545 U.S. at 170.  The trial court's reasoning is clearly at odds with the holding in

12   Johnson.  Rather than identifying the relevant circumstances and asking whether an inference of

13   discrimination could possibly be drawn, the court immediately began positing race-neutral

14   reasons for excusing the jurors.  It then relied solely on those reasons to deny the motion, a form

15   of first step analysis which the Ninth Circuit has rejected.  Johnson v. Finn, 665 F.3d 1063, 1069

16   (9th Cir. 2011) ("Contrary to the Court of Appeal's reasoning, the existence of grounds upon

17   which a prosecutor could reasonably have premised a challenge, does not suffice to defeat an

18   inference of racial bias at the first step of the Batson framework.").  In so doing, the superior

19   court implicitly required the movant to show that his alleged discriminatory motives were more

20   likely than the universe of possible race-neutral motives that the trial court could conceive of.

21   This is not the test that Batson requires.

22         Based on the foregoing, this court finds that the court of appeal's decision on this issue

23   constitutes an unreasonable application of Batson, and to the extent it amounts to a factual

24   finding, an unreasonable determination of the facts under section 2254(d)(2).  Accordingly,

25   AEDPA is no longer a bar and the court will review this claim de novo.  See Panetti, 551 U.S. at

26   948.

27   /////

28   /////

19

1        E. De Novo Review

2              The court must begin by determining whether petitioner produced sufficient evidence to

3     make out a prima facie case of discrimination.  If it finds that petitioner did not, then the inquiry

4     is at an end and there is no need to evaluate Batson steps two and three.  For the reasons stated

5     below the court concludes that petitioner failed to carry his burden of establishing a prima facie

6     case of discrimination.

7              The question is whether petitioner "produc[ed] evidence sufficient to permit the trial judge

8     to draw an inference that discrimination has occurred." Johnson, 545 U.S. at 170.  Petitioner's

9     prima facie showing was scant in the trial court, and has not changed.  Defense counsel failed to

10    make a record of the racial composition of the venire, and made no statistical argument,

11    contending only that the prosecutor's dismissal of two African American jurors must have been

12    discriminatory because they made statements on voir dire indicating that they would be fair or

13    even pro-prosecution.  Specifically, petitioner argues here as he did in superior court that (1) no

14    African American sat on the jury after the prosecution's challenge of S.R.; (2) both P.M. and S.R.

15    had given answers about incarcerated relatives which could be construed as favorable to the

16    prosecution; (3) juror S.R. had a background in law enforcement; and (4) both jurors had assured

17    the trial court of their ability to be fair if selected for the jury.  See 1 RT at 80-82; ECF No. 1 at

18    34-36.

19             Even assuming that the disputed strikes resulted in a jury with no African American

20    members, that fact would not create a prima facie case.  The Ninth Circuit has noted that a

21    "prosecutor's use of a peremptory strike against the only African-American prospective juror is a

22    relevant consideration," but "it does not by itself raise an inference of discrimination."

23    Crittenden v. Ayers, 624 F.3d 943, 955 (9th Cir. 2010); see also Boyd v. Newland, 393 F.3d

24    1008, 1013 (9th Cir. 2004) ("Even the use of two peremptory strikes against members of a

25    cognizable minority group does not necessarily suffice to constitute a prima facie showing of

26    bias.").  Although this factor might otherwise weigh in favor of a prima facie case, there is a

27    countervailing circumstance here: in between the prosecutor's challenges of P.M. and S.R.,

28    defense counsel used one of his own challenges to strike a third African-American prospective

20

juror – Michael Cole or (M.C.).  1 Aug. RT at 236.  The prosecutor stated that M.C. would have

been acceptable, had he not been challenged by defense counsel.  1 RT at 84.  The Ninth Circuit

has noted that "the willingness of a prosecutor to accept minority jurors weighs against the

findings of a prima facie case."  United States v. Chinchilla, 874 F.2d 695, 698 n.4 (9th Cir.

1989).  Taken as a whole, these circumstances do not indicate discrimination.

Petitioner's contention that P.M. and S.R. were clearly favorable jurors for the prosecution

fails to establish a prima facie case.  This argument ignores certain other aspects of P.M. and

S.R.'s answers and background which could easily have been construed as unfavorable to the

prosecution.  See Boyd, 393 F.3d at 1013 ("Evidence in the record of objective reasons to strike a

juror implies that racial bias did not motivate the prosecutor.").  P.M. brought up the lengthy

three-strikes sentence her brother was serving when the trial court merely asked how long ago he

was convicted.  1 Aug. RT at 189.  The mention of this sentence of 113 years – effectively a life

sentence – was especially stark given that the underlying conviction was for burglary.  Id.  In

response to the prosecutor asking P.M. how she felt about her brother's sentence, she stated that

she would never see her brother again and failed to offer any explanation to contextualize this

statement.[7]  Id. at 232.

With respect to S.R., her background in law enforcement was tempered by the fact that

she had a master's degree in social work – a professional field which some prosecutors have

viewed as generally more sympathetic to defendants.  See Hall v. Luebbers, 341 F.3d 706, 713

(9th Cir. 2003) ("Occupation is a permissible reason to defend against a Batson challenge, and

being a social worker could be a legitimate basis to strike a prospective juror."); Messiah v.

Duncan, 435 F.3d 186, 200 (2d Cir. 2006) (noting that it was not implausible for a prosecutor to

believe that a "full-time social service provider . . . might have more sympathy for a defendant"

than other panelists).  Additionally, S.R.'s background in law enforcement was hardly current.

She indicated that she had worked for the Department of Justice over twenty years ago at the time

---

[7] The court recognizes that it obviously does not have the benefit of observing the prospective
juror's body language or hearing her tone, both of which could offer insight into to her meaning.
It notes, however, that the trial court referenced this statement as an "expressed concern" when it
denied petitioner's Batson motion.  1 RT at 82.

1   of trial.  1 Aug. RT at 255.  Her time at the Sacramento County Jail was over thirty years ago at

2   time of trial, entirely clerical, and described by S.R. as "pretty sequestered" from the prisoners.

3   Id. at 260.  Additionally, S.R. hesitated when the trial court asked whether her relatives'

4   experiences with the criminal justice system –particularly her brother's then-recent arrest for

5   armed robbery – would "spill over" into petitioner's case.  Id. at 244-245.

6        In sum, petitioner's characterization of these prospective jurors as pro-prosecution is not

7   supported by the record.  Accordingly, there is nothing inherent about the strikes that permits an

8   inference of discrimination.  Defense counsel made no record of circumstances indicating that the

9   prosecutor questioned P.M. and S.R. differently than other prospective jurors who were not-

10   African American.  See Batson, 476 U.S. at 97 ("[T]he prosecutor's questions and statements

11   during voir dire examination . . . may support or refute an inference of discriminatory purpose.").

12   Nor has petitioner identified any portion of the jury selection record which indicates that

13   comparable non-African American jurors were accepted by the prosecution.

14        Based on the foregoing analysis of the totality of relevant circumstances, the court finds

15   that petitioner has not carried his burden of establishing a prima facie case of discriminatory

16   intent.  Accordingly, the court need not proceed to steps two and three of the Batson test and this

17   claim should be denied.

18       II.    Claim Two: Sufficiency of the Evidence for Attempted Robbery

19          A.  Petitioner's Allegations and Pertinent State Court Record

20        Petitioner argues that there was insufficient evidence to support either an attempted

21   robbery conviction or an attempted robbery special circumstance with respect to the murder

22   conviction.  ECF No. 1 at 37.  Petitioner raised this claim on direct appeal, and it was denied on

23   the merits.  Scott, 2013 WL 6485269, at *8.  Petitioner then presented the claim in a petition for

24   review to the California Supreme Court (Lodged Doc. No. 26, Pet. for Rev. at 4) and it was

25   summarily denied (id., Den. of Pet. for Rev.).

26          B.  The Clearly Established Federal Law

27        Due process requires that each essential element of a criminal offense be proven beyond a

28   reasonable doubt.  United States v. Winship, 397 U.S. 358, 364 (1970).  In reviewing the

1   sufficiency of evidence to support a conviction, the question is "whether, viewing the evidence in

2   the light most favorable to the prosecution, any rational trier of fact could have found the essential

3   elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319

4   (1974).  If the evidence supports conflicting inferences, the reviewing court must presume "that

5   the trier of fact resolved any such conflicts in favor of the prosecution," and the court must "defer

6   to that resolution."  Id. at 326.  A jury's credibility determination is not subject to review during

7   post-conviction proceedings.  Schlup v. Delo, 513 U.S. 298, 330 (1995) ("under Jackson, the

8   assessment of the credibility of witnesses is generally beyond the scope of review.").  The federal

9   habeas court determines the sufficiency of the evidence in reference to the substantive elements

10   of the criminal offense as defined by state law.  Jackson, 443 U.S. at 324 n.16.

11           C.  The State Court's Ruling

12       Petitioner raised this claim on direct appeal.  Accordingly, the opinion of the California

13   Court of Appeal is the subject of review under § 2254(d).  See Ortiz, 704 F.3d at 1034.  The state

14   court ruled as follows:

15       Scott contends there was insufficient evidence of attempted robbery
        to support the conviction on count two or the robbery-murder
16       special circumstance. He argues the evidence shows the intent was
        to kill Waters based on a motive of gang retaliation with no
17       concurrent intent to rob. While there was evidence of a previous
        intent to rob Waters, Scott contends that intent shifted to the intent
18       to kill before the robbery plan went beyond mere preparation.

19       . . .

20       The standard for judicial review of a criminal conviction challenged
        as lacking evidentiary support is well established: "the court must
21       review the whole record in the light most favorable to the judgment
        below to determine whether it discloses substantial evidence—that
22       is, evidence which is reasonable, credible, and of solid value—such
        that a reasonable trier of fact could find the defendant guilty beyond
23       a reasonable doubt." (People v. Johnson (1980) 26 Cal.3d 557,
        578.) We accord due deference to the verdict and will not substitute
24       our conclusions for those of the trier of fact. (People v. Koontz
        (2002) 27 Cal.4th 1041, 1078.) A conviction will not be reversed
25       for insufficient evidence unless it appears "that upon no hypothesis
        whatever is there sufficient substantial evidence to support [the
26       conviction]." (People v. Redmond (1969) 71 Cal.2d 745, 755.)

27       "Robbery is the felonious taking of personal property in the
        possession of another, from his person or immediate presence, and
28       against his will, accomplished by means of force or fear." (§ 211.)

                                        23

The crime of attempt requires a specific intent to commit a crime and a direct but ineffectual act done towards its commission. (§ 21a.) "The act must go beyond mere preparation, and it must show that the perpetrator is putting his or her plan into action, but the act need not be the last proximate or ultimate step toward commission of the substantive crime. [Citation.]" (People v. Kipp (1998) 18 Cal.4th 349, 376.) "Where the intent to commit the crime is clearly shown, an act done toward the commission of the crime may be sufficient for an attempt even though that same act would be insufficient if the intent is not as clearly shown. [Citation.]" (People v. Bonner (2000) 80 Cal.App.4th 759, 764.)

"There is, of course, a difference between the preparation antecedent to the commission of an offense and the actual attempt to commit it. The preparation consists in devising or arranging the means or measures necessary for the commission of the offense. The attempt is the direct movement toward the commission after preparations are made and must be manifested by acts which would end in the consummation of the particular offense unless frustrated by extraneous circumstances. [Citations.] Whenever the design of a person to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt. [Citation.]" (People v. Anderson (1934) 1 Cal.2d 687, 690 (Anderson ) (cited with approval in People v. Watkins (2012) 55 Cal.4th 999, 1021–1022 (Watkins ).))

In Watkins, supra, 55 Cal.4th 999, our Supreme Court affirmed a conviction of attempted robbery and a robbery-murder special circumstance. Defendant and his companion, after committing two robberies, drove to the covered vehicle entrance of a Holiday Inn and opened the hood of their stolen truck. (Watkins, supra, at pp. 1003–1004.) A man who was there with his family waiting on an airport shuttle walked over and looked into the engine area; his family's view of him was obscured. After a minute, he walked hurriedly back to his family and then defendant shot and killed him. (Id. at p. 1004.) The high court found the evidence sufficient to show that defendant and his companion unequivocally engaged in a deliberate ruse to lure their victim outside the view of his family so they could rob him. (Id. at p. 1023.) That the victim hurriedly walked away from the truck raised the reasonable inference that some act in furtherance of robbery—a demand for money or display of a gun—occurred behind the hood of the truck. (Ibid.)

…

Here, there was substantial evidence from which the jury could find attempted robbery. The People presented overwhelming evidence of Scott's participation in robberies in general. Detective Quinn testified one of the primary activities of the FAB gang, of which Scott was an active member, was committing robberies. The "funk" between FAB and the Elm Street Bloods began with the robbery of Tommy Martinez. Numerous text messages sent by Scott discussed robberies or licks. He also sent text messages about his need for money. Rap lyrics found in Scott's apartment referred to shooting someone and taking his money.

Further, there was evidence that Scott went with the others to Waters's apartment to rob him. A few days before the shooting, Grant had texted Scott that Waters "hit the dice" game for $4,000, suggesting he had money.[8] Further, Waters was a drug dealer and thus likely to have drugs or money or both. Earlier that evening, Grant sent Scott a message that they would "hit Mark tonight," an ambiguous phrase that could refer to either a robbery or a murder (or assault). Gray testified he left May Street with Grant, Scott, and Dixon to "hit a lick." Grant brought up the robbery, but all four were present when it was discussed. They first went to an AM/PM minimarket for gas; everyone chipped in money and Scott bought the gas. Then they drove to the Woodbridge Apartments, where Gray parked, backing in for a quick getaway, and the others got out. Scott approached Waters's car and fired multiple times.

Scott contends the evidence of a gang retaliation motive, to avenge the earlier shooting of Scott and Grant, shows his intent was murder. McGrigg testified the shooting began immediately. No property was taken from Waters either before or after the shooting, and there was no discussion of robbery afterwards. Scott also relies on Gray's testimony that he and Dixon "got played;" they were told it was a robbery when it was actually murder. The jury, however, was not required to accept entirely Gray's version of events. (People v. Allen (1985) 165 Cal.App.3d 616, 623 [jury entitled to reject some portions of a witness's testimony while accepting others].) "That the evidence might lead to a different verdict does not warrant a conclusion that the evidence supporting the verdict is insubstantial. [Citation.]" (People v. Holt (1997) 15 Cal.4th 619, 669.) Further, the jury could have found Scott had dual intents when he approached Waters.

Scott contends any intent to rob had been abandoned in the preparation stage. He argues there was no evidence of an attempted robbery "thwarted by some extraneous circumstance." Where the circumstance that prevents completion of the robbery is a change of heart by the perpetrator there can still be an attempt. (People v. Dillon (1983) 34 Cal.3d 441, 455 ["when the acts are such that any rational person would conclude a crime is about to be consummated absent an intervening force, the attempt is underway, and a last-minute change of heart by the perpetrator should not be permitted to exonerate him"].)

Scott distinguishes the cases on which the People rely to show attempted robbery and argues any plan to rob Waters never went beyond mere preparation. We find Anderson, supra, 1 Cal.2d 687, controlling. In Anderson, defendant, who had that same month engaged in a three robberies using a gun, approached the ticket office of the Curran Theater with the admitted intent to commit a robbery. When he was within two feet of the office, he pulled out a gun. Defendant testified the gun "went off." (Anderson, supra, at

---

[8] Scott argues there was no reason to rob Waters because he had spent his money on a car and he and his companions saw Waters and his car the day of the shooting. We are not convinced that these defendants put this degree of careful thought into their actions.  [footnote in original text]

p. 689.) Our Supreme Court found defendant's actions went beyond mere preparation. "[W]hen he 'walked in there [Curran Theater entrance] about two feet from the grill' and 'pulled out the gun' and 'was just going to put it up in the cage when it went off,' we are satisfied that his conduct passed far beyond the preparatory stage and constituted direct and positive overt acts that would have reasonably tended toward the perpetration of the robbery had the gun not exploded, for one reason or another, and frustrated the plan to consummate the offense. We see no escape from the conclusion that defendant's conduct constituted an attempt to commit robbery." (Id. at p. 690.)

While Scott did not admit the intent to rob, as the defendant did in Anderson, the jury could conclude from the evidence just outlined that Scott had the intent to rob Waters when he approached him with his gun. As in Anderson, his actions went beyond preparation; the robbery was thwarted only by the firing of the gun "for one reason or another," and constituted attempted robbery. Sufficient evidence supports Scott's conviction for attempted robbery and the robbery-murder special circumstance.

Scott, 2013 WL 6485269, at *8-10.

      D. Objective Reasonableness Under § 2254(d)

      The court of appeal's rejection of this claim was not objectively unreasonable. The court recognizes that petitioner has emphasized evidence which weighs against a finding that he attempted to rob the victim. ECF No. 1 at 19-21. There was, however, sufficient evidence by which a rational jury could make such a finding. Evidence was presented which indicated that petitioner had previously planned or wanted to commit other robberies. 6 RT 1614-1618, 1626-1629, 1648-1651. There was also testimony that petitioner was aware of the fact that the victim had recently won a substantial amount of money in a dice game. Id. at 1644-1645. It is not the province of this court to re-weigh evidence or resolve evidentiary conflicts. See Milton v. Wainwright, 407 U.S. 371, 377 (1972) (federal habeas courts "do not sit to retry state cases de novo but, rather, to review for violations of federal constitutional standards"); see also Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004) ("A jury's credibility determinations are . . . entitled to near-total deference under Jackson."). A federal habeas court is limited to analyzing whether a rational trier of fact could have reached a finding of guilt beyond a reasonable doubt. Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004). Based on the evidence, the court answers that question in the affirmative and, consequently, this claim should be denied.

26

1    III.     Claim Three: Causation Instruction

2              A.   Petitioner's Allegations and Pertinent State Court Record

3         Petitioner alleges that the trial court improperly instructed the jury on causation, and that

4    his enhancements for firearm discharge causing great bodily injury or death therefore must be

5    reversed.  ECF No. 1 at 42.  The court of appeal prefaced its analysis of this claim by explaining:

6              Section 12022.53(d) enhances the sentence, by an additional term
               of 25 years to life, of anyone who, in the commission of specified
7              felonies, including murder and attempted robbery (§ 12022.53,
               subd. (a)(1), (4), (18)), "intentionally and personally discharged a
8              firearm and proximately caused great bodily injury, as defined in
               Section 12022.7, or death, to any person other than an
9              accomplice...." The jury found this enhancement true as to both the
               murder and attempted robbery charges.
10
               Scott contends the enhancements must be reversed due to
11             instructional error. He contends the trial court erred by including
               irrelevant and misleading instructions on accomplices and group
12             liability and by failing to define proximate causation. He contends
               these errors permitted the jury to find the enhancement true based
13             solely on acts of an accomplice (Grant). He asserts the instructional
               error affected his substantial rights because it lowered the
14             prosecution's burden of proof. (See § 1259 [instruction reviewable
               without objection where defendant's substantial rights affected].)
15             Scott's argument is premised on his view that the jury could have
               concluded from the evidence that Grant fired the .22, which
16             contained the only bullets that struck Waters.

17   Scott, 2013 WL 6485269, at *11.  The court of appeal went on, as presented in greater detail

18   below, to deny this claim on the merits.  Petitioner raised the claim in his petition for review to

19   the California Supreme Court, (Lodged Doc. No. 26, Pet. for Rev. at 10) and it was summarily

20   denied (Id., Den. of Pet. for Rev.).  Petitioner challenges the instruction here on the same grounds

21   forwarded in state court.

22             B.   The Clearly Established Federal Law

23        Challenges to state jury instructions are grounded in state law and, accordingly, not

24   generally cognizable on federal habeas review.  Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).

25   In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely

26   undesirable, erroneous, or even universally condemned, but must violate some due process right

27   guaranteed by the fourteenth amendment."  Cupp v. Naughten, 414 U.S. 141, 146 (1973) (internal

28   /////

27

quotations omitted).  The reviewing court should consider an instruction in the context of the

entire record rather than judging it in isolation.  McGuire, 502 U.S. at 72.

C. The State Court's Ruling

Petitioner raised this claim on direct appeal.  Accordingly, the opinion of the California

Court of Appeal is the subject of review under § 2254(d).  See Ortiz, 704 F.3d at 1034.  The state

court ruled as follows:

> The trial court instructed the jury with the language of CALCRIM No. 3149 as follows:
>
> "If you find the defendant guilty of the crimes charged in Counts One or Two, you must then decide whether, for each crime, the People have proved the additional allegation that the defendant personally and intentionally discharged a firearm during that crime causing great bodily injury or death. You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime.
>
> "To prove this allegation, the People must prove that:
>
> "1. The defendant personally discharged a firearm during the commission of that crime;
>
> "2. The defendant intended to discharge the firearm; and
>
> "3. The defendant's act caused great bodily injury to or the death of a person.
>
> "The term firearm is defined in another instruction.
>
> "*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.
>
> "An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act.
>
> "A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence.
>
> "There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death.
>
> "A *substantial factor* is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death.

28

"A person is an *accomplice* if he or she is subject to prosecution for the identical crime charged against the defendant. A person is subject to prosecution if he or she committed the crime or if:

"1. He knew of the criminal purpose of the person who committed the crime; and

"2. He intended to, and did in fact, aid, facilitate, promote, encourage, or instigate the commission of the crime or participate in a criminal conspiracy to commit the crime.

"The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved."

The court also instructed with the language of CALCRIM No. 3160 as follows:

"*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"If you conclude that more than one person shot Perell Waters and you cannot decide which person caused which injury, you may conclude that the defendant personally inflicted great bodily injury on Perell Waters if the People have proved that:

"1. Two or more people, acting at the same time, shot Perell Waters and inflicted great bodily injury on him;

"2. The defendant personally used physical force on Perell Waters during the group assault; and

"3. The amount or type of physical force the defendant used on Perell Waters was enough that it alone could have caused Perell Waters to suffer great bodily injury. The defendant must have applied substantial force to Perell Waters. If that force could not have caused or contributed to the great bodily injury, then it was not substantial."

…

This enhancement requires that a defendant personally discharge a firearm, but only that he proximately cause great bodily injury or death. (People v. Bland (2002) 28 Cal.4th 313, 336 (Bland).) "A person can proximately cause a gunshot injury without personally firing the weapon that discharged the harm-inflicting bullet." (Id. at p. 337.) The Bland court approved a previous instruction that defined proximate cause as "an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the great bodily injury or death and without which the great bodily injury or death would not have occurred." (Id. at pp. 335, 338.)

Here the trial court instructed with the updated CALCRIM No. 3149 instruction that does not use the term "proximate cause."

The instruction did, however, inform the jury that defendant's act had to cause great bodily injury or death, and that for an act to cause death, death must be "the direct, natural, and probable consequence of the act and the death would not have happened without the act." This instruction was sufficient to adequately convey the concept of proximate causation as set forth in Bland.

The Bland court also held that where there may be more than one cause of death, the jury should be instructed on concurrent causes. (Bland, supra, 28 Cal.4th at p. 335.) At that time, the standard instruction was CALJIC No. 3.41. (Ibid.) Here, the court read the jury CALCRIM No. 3160, set forth ante, which instructed it how to determine whether Scott was responsible for the infliction of great bodily injury if there was more than one shooter.[9]

Scott contends CALCRIM No. 3160 is flawed because it permitted the jury to find the necessary causation if he "personally used physical force" during a group assault. He argues this instruction permitted the jury to find the enhancement true without finding that he proximately caused great bodily injury or death. But the instruction required that Scott's physical force on Waters be "enough that it alone could have caused Perell Waters to suffer great bodily injury." The force must have been substantial, causing or contributing to the great bodily injury. " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' " (People v. Castillo (1997) 16 Cal.4th 1009, 1016 (Castillo).) Further: "In reviewing a claim of error in jury instructions in a criminal case, this court must first consider the jury instructions as a whole to determine whether error has been committed. [Citations.] We may not judge a single jury instruction in artificial isolation, but must view it in the context of the charge and the entire trial record." (People v. Moore (1996) 44 Cal.App.4th 1323, 1330–1331 (Moore ).)

…

This enhancement does not apply if the death or great bodily injury is to an accomplice. (§ 12022.53, subd. (d).) The trial court deleted the reference to an accomplice in setting forth the elements to be proved, but included the definition of an accomplice. Scott contends that merely including the definition of an accomplice permitted the jury to find the enhancement true based solely on Scott's accomplice status. We disagree.

Although the definitional instruction was out of place as positioned, the trial court advised the jurors that not all of the instructions were necessarily applicable. Further, it advised the jurors not to assume that an instruction applied merely because it was provided to them.

---

[9] The infliction of death would constitute the infliction of great bodily injury. (See People v. Gonzales (1994) 29 Cal.App.4th 1684, 1694 [gross vehicular manslaughter while intoxicated is a serious felony under section 1192.7, subdivision (c)(8)—inflicting great bodily injury], called into doubt on other grounds in People v. Reed (1996) 13 Cal.4th 217, 229.) [footnote in original text]

(See CALCRIM No. 200.) In the absence of evidence to the contrary, we presume the jurors found the accomplice instruction inapplicable and simply disregarded it. (Cf. People v. Pride (1992) 3 Cal.4th 195, 249 [inapplicable instruction on consciousness of guilt from effort to suppress evidence was "at worst" superfluous and harmless].)

Giving a superfluous instruction raises a concern only where there is a serious concern that the instruction misled the jury. "When reviewing a purportedly ambiguous jury instruction, we ask whether there is a reasonable likelihood the jury misconstrued or misapplied the challenged instruction. [Citations.]" (People v. Palmer (2005) 133 Cal.App.4th 1141, 1156.) In making this determination, we consider the entire charge to the jury. (People v. Musselwhite (1998) 17 Cal.4th 1216, 1248.) Here we find no reasonable likelihood the jury was misled. The jury could not have reasonably determined the enhancement was true based solely on Scott's accomplice status because the instruction clearly stated that the People had to prove that Scott personally and intentionally discharged a firearm, and "[t]he defendant's act caused great bodily injury to or the death of a person." This language, directing the jury to consider Scott's act, distinguishes this case from People v. Carrillo (2008) 163 Cal.App.4th 1028 (Carrillo ), on which Scott relies.

In Carrillo, several persons fired at the victim, who was hit by rounds from two or three different guns, but there was no evidence Carrillo fired one of those guns. (Carrillo, supra, 163 Cal.App.4th at p. 1037.) The trial court instructed on causation using the same language as here, but instructed that the "defendant's or a perpetrator's act caused great bodily injury to or the death of a person." (Id. at p. 1036, original italics.) Thus, in Carrillo, the jury instructions permitted the jury to find the enhancement true without finding that the defendant proximately caused death or great bodily injury.[10] That is not the case here, where the instruction required that the jury find that Scott caused great bodily injury or death to find the enhancement true. There was no prejudicial error.

Scott, 2013 WL 6485269, at *11–14.

D.  Objective Reasonableness Under § 2254(d)

It is settled law that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." See

/////

---

[10] In Carrillo, the court found instructional error, but found that error harmless because in finding Carrillo guilty of murder, the jury found his acts caused the victim's death. "Regardless of whether the jury found Carrillo guilty because he fired the fatal shot or aided and abetted the murder by firing at Ramirez, under Bland and [People v.] Sanchez [ (2001) 26 Cal.4th 834], he was a proximate cause of the death. (Carrillo, supra, at p. 1038.) [footnote in original text]

1 | <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005).  Accordingly, the court of appeal's finding that the

2 | jury instructions did not violate state law must be accorded deference.

3 |      This court also cannot conclude that the instructions denied petitioner due process by

4 | infecting his entire trial with fundamental unfairness.  As the court of appeal noted, the jury's

5 | instructions for use of a firearm causing great bodily harm (or death) enhancement under

6 | CALCRIM No. 3149 required them to find that: (1) petitioner personally discharged a firearm

7 | during commission of the crime; (2) petitioner intended to discharge the firearm; and

8 | (3) petitioner's act caused great bodily injury or death.  1 CT 281.  Additionally, the instruction

9 | on great bodily injury under CALCRIM 3160 required the jury to find that "[t]he amount or type

10 | of physical force the defendant used on Perell Waters was enough *that it alone* could have caused

11 | Perell Waters to suffer great bodily injury." <u>Id.</u> at 283 (emphasis added).  Finally, the jury was

12 | instructed that it could ignore superfluous instructions, like the accomplice language which was

13 | included in CALCRIM No. 3149 (<u>Id.</u> at 282).  Specifically:

> Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give you a particular instruction that I am suggesting anything about the facts.  After you have decided what the facts are, follow the instructions that do apply to the facts as you find them.

17 | <u>Id.</u> at 210.  The jury is presumed to have followed all of these instructions.  <u>Weeks v. Angelone</u>,

18 | 528 U.S. 225, 234 (2000).  On this record, under any standard of review, there is no due process

19 | violation entitling petitioner to relief.

20 | CONCLUSION

21 |      For all the reasons explained above, petitioner's <u>Batson</u> claim fails on de novo review and

22 | the state courts' denial of petitioner's other claims was not objectively unreasonable within the

23 | meaning of 28 U.S.C. § 2254(d).

24 |      Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas

25 | corpus be denied.

26 |      These findings and recommendations are submitted to the United States District Judge

27 | assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within fourteen days

28 | after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  <u>See</u> 28 U.S.C. § 2253(c)(2).

DATED:  July 28, 2017.

_____
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE